**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

KAREN ZUPP, on behalf of
A.W.E., Jr.,

        Plaintiff,

    vs.                          Civil Action 2:14-cv-2545
                                      Chief Judge Sargus
                                      Magistrate Judge King

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

## REPORT AND RECOMMENDATION

This is an action instituted under the provisions of 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security denying the application for child's supplemental security income filed by Karen Zupp ("plaintiff") on behalf of A.W.E., Jr., a child under the age of 18 ("claimant"). This matter is now before the Court for consideration of *Plaintiff's Statement of Errors*, ECF 12, *Opposition to Plaintiff's Statement of Errors*, ECF 19, and *Plaintiff's Reply Memorandum of Law in Support of a Social Security Appeal*, ECF 20.

**I.    Background**

The claimant was born on June 28, 2001. *PAGEID* 255. Plaintiff, who is claimant's grandmother, protectively filed the application for benefits on November 14, 2011, alleging that claimant has been disabled since June 1, 2008. *PAGEID* 255-265. The application was denied initially and upon reconsideration and claimant requested a *de*

1

*novo* hearing before an administrative law judge. *PAGEID* 161-176.

An administrative hearing was held on August 7, 2013, at which plaintiff, who was represented by counsel, appeared and testified, as did claimant. *PAGEID* 98-132.

In a decision dated August 23, 2013, the administrative law judge concluded that claimant was not disabled from November 14, 2011, the date the application was filed, through the date of the administrative decision. *PAGEID* 80-92.

Claimant was 12 years of age on the date of the administrative law judge's August 23, 2013 decision. *See PAGEID* 255. Claimant has not engaged in substantial gainful activity at any time relevant to the administrative law judge's decision. *PAGEID* 83.

## II.  **Evidence of Record**[1]

Claimant lived with his biological parents, who abused drugs and alcohol, until he was removed from their custody at the age of six months because of neglect. *PAGEID* 775. He lived with his maternal grandmother until she suffered a heart attack when he was three years old. *Id.* Claimant then lived for a number of years with his maternal aunt, who abused him sexually and verbally. *PAGEID* 775-776. Claimant was returned to his maternal grandmother, who now has full custody. *PAGEID* 776.[2]

On July 20, 2010, claimant presented at Nationwide Children's emergency department with fractures of both bones in the right

---

[1] The Court's discussion of the evidence is limited to the issues presented in the *Statement of Errors*.
[2] Claimant's father is currently in prison and his mother has also served periods of confinement. *PAGEID* 776.

2

forearm.  *PAGEID* 848, 860.  Claimant underwent a closed reduction and cast application and, later, intramedullary nailing of the radial and ulnar shafts.  *PAGEID* 860-861, 845-49.  Follow-up examinations revealed good alignment of the forearm and well-healed scars.  *PAGEID* 834, 838-840, 842-844.  The hardware was removed one year later. *PAGEID* 828-331.

Claimant has been treated at the Scioto Paint Valley Mental Health Center ("Scioto Paint Valley") since at least August 2008 for depression and anxiety. *See PAGEID* 769. On September 1, 2010, claimant was seen for anxiety, depression, sexual abuse, problems with interpersonal relationships and parent/child relationships, and other family problems.  *PAGEID* 604-605.  Claimant, who was then in the fourth grade, reported hearing voices and seeing shadows.  *PAGEID* 535. Claimant was diagnosed with adjustment disorder with mixed anxiety and depressed mood, and r/o post-traumatic stress disorder. *PAGEID* 484, 609.  Claimant was assigned a current Global Assessment of Functioning ("GAF") score of 54-56.  *Id*.

Claimant reported that he hated himself and his life and that nothing made him happy.  *PAGEID* 525, 549, 551, 604, 606.  He wanted to be homeschooled because children and teachers at school were mean to him.  *PAGEID* 549. Plaintiff reported that claimant experienced depression, mood swings, and difficulty at school with bullies. He wet the bed when upset.  She had to remind him to flush the toilet and to pick up his clothes.  *PAGEID* 352-353, 550-551.

Progress notes from January 2011 include claimant's admission

that he had purposely hurt himself. *PAGEID* 469.  In February 2011, a crisis plan was developed after plaintiff reported that claimant had expressed suicidal thoughts.  *PAGEID* 464.  Throughout the following months, claimant worked towards developing effective ways to deal with stress and "to increase outlet of emotions in order to improve level of function[.]" *PAGEID* 392-94, 395-99, 417-36, 591-95.  Progress notes continued to reflect observations of depressed mood, restricted affect, and minimal eye contact.  *PAGEID* 387.

Claimant began a course of home schooling in September 2011, *PAGEID* 387, following which decreased anxiety and positive interaction with peers in the neighborhood were noted. *PAGEID* 383-84. However, on September 27, 2011, claimant was taken to the Scioto Paint Valley Crisis Center following threats of suicide.  *PAGEID* 368, 374.  Claimant reported frequent crying, racing thoughts, and visual and auditory hallucinations. *Id*. *See also PAGEID* 575. He had gained significant weight over the course of the prior month. *Id*.  Progress notes include reports of psychological pain, stress, self-hate, and hopelessness.  *Id*.

An October 2011 crisis assessment included reports of rage and threats of suicide. *PAGEID* 361.  Plaintiff reported that claimant experienced frequent crying, difficulty sleeping, and separation anxiety. *Id*. It was noted that Herbert Segnitz, M.D., claimant's treating family practitioner since 2008, had switched claimant from Abilify to Imipramine because of claimant's weight gain.  *Id*. Diagnoses included post-traumatic stress disorder and major

4

depression, r/o bipolar disorder.  *PAGEID* 362.

Claimant was admitted to the Ohio Hospital for Psychiatry on October 28, 2011. *PAGEID* 361, 487-489.  On initial examination, claimant's affect was depressed and his mood was sad.  Intellectual functioning was estimated as average; his memory was intact.  He was well oriented, his judgment was impaired, and his insight was limited. *PAGEID* 488. He was assigned a GAF score of 20. *Id.*  Claimant was discharged on November 2, 2011, with a diagnosis by Carmen Harlan, M.D., of major depression, single episode, severe, without psychosis, and a GAF score of 50.  *PAGEID* 348-49.  Clonidine, Trileptal, and Lexapro were prescribed. *Id.*

Outpatient progress notes from Scioto Paint Valley later that month reported "no change" in behavior. *PAGEID* 358.

In December 2011, Dr. Segnitz diagnosed reactive anxiety disorder and depressive disorder, *PAGEID* 491, characterized claimant's anxiety and depression as "severe," *PAGEID* 490, and commented that medications have been unsuccessful in treating claimant's overall mood and cognition. *PAGEID* 490-91. According to Dr. Segnitz, claimant's ability for self-care was "adequate" and consistent with his age. *PAGEID* 491. In evaluating claimant's functional limitations, Dr. Segnitz opined that his patient was markedly limited in the domain of health and physical well-being,[3] and was less than markedly limited in the domains of acquiring and using information, attending and completing tasks,

---

[3] Dr. Segnitz actually checked both "Less than Marked" and "Marked" in the domain of Health & Physical Well-Being. *PAGEID* 492.

5

interacting and relating with others and caring for himself. *PAGEID* 492. There was no evidence of limitation in claimant's ability to move about and manipulate objects. *Id.*

In January 2012, state agency physicians and a psychologist evaluated the record and opined that claimant had no limitation in the domains of acquiring and using information, attending and completing tasks, moving about and manipulating objects; he was less than markedly limited in the domains of interacting and relating with others, caring for himself, and health and physical well-being. *PAGEID* 139-40.

Scioto Paint Valley counseling progress notes from January and February 2012 include the findings that claimant was alert and oriented, and his thoughts were logical and goal directed. *PAGEID* 542. His mood ranged from pleasant and calm, *PAGEID* 542, 544, 545, to depressed, *PAGEID* 543, or anxious, *PAGEID* 547. His affect was appropriately broad and reactive. *Id.* His social interaction and participation had increased and he was nearly current with his on-line course of study. *PAGEID* 543. In March 2012, claimant was considering returning to school for the next school year, rather than continuing on-line schooling. *PAGEID* 537, 540. In early May 2012, claimant's mood was depressed and his affect was blunted and restricted. *PAGEID* 536. He maintained minimal eye contact. *Id.* By later in May and in June 2012, claimant's mood was again characterized as pleasant and his affect was appropriately broad and reactive. *PAGEID* 532-33. In June 2012, claimant reported that "things have been more positive at home."

*PAGEID* 532.

That same month, claimant underwent a consultative psychological examination by James C. Tanley, Ph.D., at the request of the state agency. *PAGEID* 611-13. Claimant was oriented x4 and his intellectual functioning was average. *PAGEID* 612. Dr. Tanley diagnosed depressive disorder, nos, and assigned a GAF of 60. *Id.* Functionally, claimant was able to converse appropriately and was able to learn and retain new information in a one-on-one setting, was able to pay attention and had no difficulty sustaining his attention, and was able to sustain relationships and follow directions. *PAGEID* 613. However, in the area of self-care, claimant "needs to be reminded to do self-care" and, according to plaintiff, did not "do it well." *Id.*

In July 2012, state agency experts again reviewed the record and opined that claimant was not limited in the domains of acquiring and using information, attending and completing tasks, and moving about and manipulating objects; he was less than markedly limited in the domains of interacting and relating with others, caring for himself, and health and physical well-being. *PAGEID* 152-53.

The record includes progress notes from claimant's counseling sessions at Scioto Paint Valley from June 2012 to October 2012. *PAGEID* 614-769. However, the records for that period are entirely illegible. *See PAGEID* 615-642.

In January 2013, claimant underwent a psychiatric evaluation at Nationwide Children's Hospital Behavioral Medicine and Consultation Clinic upon referral from his doctor. *PAGEID* 775. Reported diagnoses

7

included asthma, ADHA, sexual abuse, neglect, problems with learning, obesity, mood disorder and head injuries. *PAGEID* 770-71. Claimant reported sleep disturbances. *PAGEID* 773. Findings on examination included visual and auditory hallucinations, symptoms of post-traumatic stress, inattention, hyperactivity/impulsivity, and anger outbursts. *PAGEID* 776-78. On mental status examination, claimant's mood was characterized as sad, his affect was full, his attention and concentration were impaired as was his memory, his insight was good and his judgment was appropriate.  *PAGEID* 783. Diagnoses included major depressive disorder, recurrent, moderate, posttraumatic stress disorder, and status post sexual abuse. *PAGEID* 785. His GAF was 55. *Id*. The following notation appears in these records: "Is the patient Severely Emotionally Disturbed? Yes." *Id*. A sleep evaluation was scheduled. *PAGEID* 786.

In March 2013, claimant underwent *in situ* pinning of the left proximal femur for fixation of a slipped capital femoral epiphysis. *See PAGEID* 807, 817.

At the administrative hearing, claimant testified that his grades in the sixth grade were "okay," *PAGEID* 104, and that he got As in math, *PAGEID* 108, but that he had problems with other students. *PAGEID* 104. Some students picked on him, but he "work[ed] through that okay." *Id*. He has friends with whom he socializes and gets along well at school and at home. *PAGEID* 104-05. He plays football in an organized league. *PAGEID* 105-06. He also participates in "free running" twice per week with his friends. *PAGEID* 107. He attends church. *PAGEID* 106.

8

After school, claimant does homework and then plays video games until dinner. *PAGEID* 108-09. He cleans his room, takes out the garbage, dries the dishes and mows the yard. *PAGEID* 109-10. He watches TV and reads for school. *PAGEID* 112. In describing his depression, claimant testified that he is "sad all the time." *PAGEID* 113. He takes Prozac, Clonidine, and Singulair, *PAGEID* 110-11, but his medications have not completely alleviated his depression. *PAGEID* 113. He had cut himself earlier that year, because "[i]t kind of relieved [his] pain, basically." *PAGEID* 114. He also has nightmares almost every night. *PAGEID* 115. He has difficulty concentrating in school. *PAGEID* 115-16.

Plaintiff testified that claimant is "very, very depressed all the time." *PAGEID* 117. He has only a couple friends and has difficulty "go[ing] anywhere because of how he feels and what happens when he does go." *Id*. He has gotten into trouble by following friends. *PAGEID* 118. Claimant had been undergoing mental health treatment for two or three years, but there has been no improvement in his mood. *PAGEID* 199. Medication has not helped. *PAGEID* 120. Claimant does well in school, "but it's a chore to get him to do his homework, clean his room. It's like his mind is somewhere else." *Id*. She must repeat directions for chores, and he can do homework for only 15 to 20 minutes. *PAGEID* 121. However, he can play video games for up to four hours at a time. *Id*. He is restless at night. "[He] wets the bed when he has a bad dream. When he has a real bad nightmare [once or twice per week] he'll come and crawl in the bed with me like he's scared to death." *PAGEID* 122. He had wet the bed two or three times during the

prior month. *Id*.

### III. Administrative Decision

The administrative law judge found that claimant's severe impairments consist of status-post open reduction internal fixation of both bones in right forearm; status-post fixation of proximal left femur; asthma; refractive amblyopia of the left eye; obesity; obstructive sleep apnea; speech articulation disorder; major depressive disorder; and post-traumatic stress disorder. *PAGEID* 83. The administrative law judge expressly considered Listings 101.00, 102.00, and 103.00 and found that claimant's impairments, whether considered singly or in combination, neither meet nor medically equal a listed impairment. *Id*. The administrative law judge also found that claimant does not "have an impairment or combination of impairments that results in either 'marked' limitations in two domains of functioning or 'extreme' limitation in one domain of functioning." *PAGEID* 92. The administrative law judge specifically found that claimant has less than marked limitations in (1) interacting and relating with others, (2) the ability to care for himself, and (3) health and physical well-being; he has no limitation in (1) acquiring and using information, (2) attending and completing tasks, and (3) moving about and manipulating objects. *PAGEID* 88-92. The administrative law judge therefore concluded that claimant was not disabled within the meaning of the Social Security Act from November 14, 2011, through the date of the administrative decision. *PAGEID* 92.

**IV.    Standards**

Pursuant to 42 U.S.C. § 405(g), judicial review of the Commissioner's decision is limited to determining whether the findings of the administrative law judge are supported by substantial evidence and employed the proper legal standards. *Richardson v. Perales*, 402 U.S. 389 (1971); *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). Substantial evidence is more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Buxton v. Haler*, 246 F.3d 762, 772 (6th Cir. 2001); *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981). This Court does not try the case *de novo*, nor does it resolve conflicts in the evidence or questions of credibility. *See Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

In determining the existence of substantial evidence, this Court must examine the administrative record as a whole. *Kirk*, 667 F.2d at 536. If the Commissioner's decision is supported by substantial evidence, it must be affirmed even if this Court would decide the matter differently, *see Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion. *Longworth,* 402 F.3d at 595.

Claimant was under the age of 18 at all relevant times. A child is disabled under the Social Security Act if he has a medically determinable impairment that results in "marked and severe functional

11

limitations" which meet the 12-month durational requirement of the Act.  42 U.S.C. §1382(a)(3)(C)(i).  In determining whether a child's impairments satisfy this standard, the Commissioner's regulations prescribe a 3-step sequential evaluation. 20 C.F.R. § 416.924(b)-(d).  First, the Commissioner must determine whether the child is engaging in substantial gainful activity.  *Id.*  If so, the child is not disabled and the Commissioner is not required to further review the claim.  *Id.*  Second, the Commissioner must determine whether the child has a "severe" impairment, *i.e.,* one that is more than a slight abnormality and causes more than minimal functional limitation.  *Id.*  If the child does not, the child is not disabled.  *Id.*  Lastly, the Commissioner must determine if the child has an impairment that meets, medically equals, or functionally equals a listed impairment.  *Id.*  If so, the child will be found to be disabled.  *Id.*

        For an impairment or combination of impairments to be functionally equivalent to a listed impairment, the child must have "marked" limitations in two functional areas or an "extreme" limitation in one functional area.  To make this determination, it is necessary to evaluate the child's abilities in six "domains": (1) the ability to acquire and use information; (2) the ability to attend to and complete tasks; (3) the ability to interact and relate with others; (4) the ability to move about and manipulate objects; (5) the ability to care for oneself; and (6) one's general health and physical well-being.  20 C.F.R. § 416.926a(b)(1).

        A "marked" limitation is defined in the regulations, in

12

relevant part, as follows:

(i) We will find that you have a "marked" limitation in a domain when your impairment(s) interferes seriously with your ability to independently initiate, sustain, or complete activities. Your day-to-day functioning may be seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities. "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme." It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean.

20 C.F.R. § 416.926a(e)(2)(i).

The regulations define an "extreme" limitation, in relevant part, as follows:

We will find that you have an "extreme" limitation in a domain when your impairment(s) interferes very seriously with your ability to independently initiate, sustain, or complete activities. Your day-to-day functioning may be very seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities. "Extreme" limitation also means a limitation that is "more than marked." "Extreme" limitation is the rating we give to the worst limitations. However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function. It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean.

20 C.F.R. § 416.926a(e)(3)(i).

V.  **Discussion**

In her *Statement of Errors*, plaintiff argues that the administrative law judge's determination that claimant's impairments are not functionally equivalent to the listings is unsupported by substantial evidence, that the administrative law judge erred by according inadequate weight to the opinion of claimant's primary care

physician, and that the administrative law judge's credibility findings are unsupported by substantial evidence. Because the Court concludes that plaintiff's first claim is meritorious, it need not and does not consider her remaining claims.

The administrative law judge evaluated claimant's functional capacity in the six functional domains:

> . . .[T]he undersigned determined that the claimant had no limitation in acquiring and using information, attending and completing tasks, and moving about and manipulating objects. However, the undersigned did determine that the claimant had less than marked limitations in interacting and relating with others, health and physical well-being, and caring for himself.

*PAGEID* 84. *See also PAGEID* 88. In reaching this determination, the administrative law judge gave "little weight" to the November 2011 opinion of plaintiff's treating provider, Dr. Segnitz. *PAGEID* 86.

> Dr. Segnitz provided this opinion shortly after doctors had hospitalized the claimant for suicidal ideation and he did not have the benefit of later records, which showed that conservative treatment generally controlled the claimant's symptoms. In addition, this opinion was inconsistent with the other opinion evidence in the record, which the undersigned found credible . . . ."

*Id*. Instead, the administrative law judge gave "considerable weight" to the opinions of the consultative psychologist, Dr. Tanley, and to the state agency reviewers

> because they were generally consistent with the claimant's treatment record, . . . Specifically, while the claimant had some difficulties relating with teachers, needed to be reminded of self-care activities, and had exhibited suicidal ideation and self-harm behavior, conservative treatment generally appeared to control his mental health symptoms after doctors hospitalized him in late 2011. In addition, although he continued to struggle with weight issues, conservative treatment appeared to control his

14

physical impairments after some surgical interventions. *PAGEID* 87.

In making this finding, the administrative law judge did not appear to recognize that the reports and opinions of Dr. Tanley and the state agency reviewers were not based on all the evidence of record. In particular, those experts did not have the benefit of the January 2013 psychiatric evaluation at Nationwide Children's Hospital Behavioral Medicine and Consultation Clinic, in which claimant was characterized as "severely emotionally disturbed." *PAGEID* 785. Although an administrative law judge is not prohibited from adopting the opinion of a source that has not reviewed the entire record, *Blackley v. Commissioner of Social Security*, 581 F.3d 399, 409 (6th Cir. 2009), 20 C.F.R. § 416.927(c)(4)), before doing so, the administrative law judge must provide "some indication" that he "at least considered" that the source did not review the entire record. *Blackley,* 581 F.3d at 409. The administrative law judge did not do so here.[4] Under these circumstances, the Court concludes that the matter must be remanded to the Commissioner for further consideration.

It is therefore **RECOMMENDED** that the decision of the Commissioner of Social Security be reversed pursuant to Sentence 4 of 42 U.S.C. § 405(g) and that the matter be remanded for further consideration.

If any party seeks review by the District Judge of this *Report*

---

[4] Moreover, the Court is concerned that a significant portion of claimant's treatment records for the period following Dr. Tanley's consultative examination and the state agency's experts' reviews are illegible. *See PAGEID* 615–42.

*and Recommendation*, that party may, within fourteen (14) days, file and serve on all parties objections to the *Report and Recommendation*, specifically designating this *Report and Recommendation*, and the part thereof in question, as well as the basis for objection thereto.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  Response to objections must be filed within fourteen (14) days after being served with a copy thereof.  Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court.  *See*, *e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation).  Even when timely objections are filed, appellate review of issues not raised in those objections is waived.  *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

16

January 22, 2016                          *s/Norah McCann King*
                                 _____
                                       Norah M<sup>c</sup>Cann King
                                 United States Magistrate Judge


17